# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF OKLAHOMA

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| Plaintiff, | ) | |
| vs. | ) | NO. CR-10-0312-HE |
| SHELLA DELANTE COULTER, | ) | |
| Defendant. | ) | |

## **ORDER**

Defendant Shella Coulter has been charged in a one count indictment with possession of a firearm after a felony conviction, in violation of 18 U.S.C. §922(g)(1). He filed a motion to suppress evidence seized or obtained as a result of a police detective's entry into his residence. An evidentiary hearing was held on Tuesday, October 26, 2010. One of the arresting officers testified, as did defendant and his girlfriend.[1] Based on their testimony, the court finds the following facts to have been established by a preponderance of the evidence.

On April 13, 2010, around 5:00 p.m., Oklahoma City police detective Phil Williams and Midwest City police detective Josh Herren[2] were conducting surveillance on a house in an Oklahoma City neighborhood in the vicinity of Northwest 78th and Wilshire Boulevard. The officers were not in uniform and were driving an unmarked green pickup with tinted windows. Because the house they were watching, located at 7904 Debar Circle, was on a cul

---

[1] Defendant's mother and the mother of his brother's child also testified.

[2] The two officers were assigned to the Safe Streets Task Force of the FBI.

de sac, the officers risked being noticed if they parked their vehicle on the street. The officers kept an eye on the house by cruising through the neighborhood. Their path took them repeatedly past defendant's residence at 8126 N.W. 78th Terrace. When they passed his house the first time, detective Williams observed defendant standing next to a Yukon parked in his driveway talking on the phone. During their next several passes the defendant, who continued to be on the phone, threw his arms up as if gesturing to the officers and cocked his head sideways as if questioning their presence. He walked out to the street and checked his mailbox and, at one point when the officers passed by, threw his arms up and slapped his chest.

The last time they drove by the residence defendant stepped out almost into the street and leaned into it with his arms out as if he was flagging the truck down. Detective Williams, who was driving, stopped the truck and the officers exited the vehicle. They approached defendant, told him they were police officers – their badges were visible – and asked him what he wanted. He responded with "I don't have to talk to you." They asked him for identification and defendant repeated that he did not have to speak with them. Both detectives told defendant he needed to get off the phone. Detective Herren reached out as if to grab it and defendant drew his arm, which held the phone, back. Thinking defendant might be going to hit him, Herren grabbed defendant's arm, swept his legs out from under him and placed him on the ground. The phone was taken and hung up. Defendant was handcuffed for his and the officers' safety.

Defendant said he had not realized the officers were policemen. Detective Williams

asked defendant who was in the house and he replied only his girlfriend. During one of their drive-bys, the officers had observed a woman in front of the residence talking to defendant.

Williams went and knocked on the front door and defendant's girlfriend, Lori Silva, came out. In response to Williams' questions she provided her name and said she lived there. Ms. Silva was brought out to the front yard and seated at the edge of the driveway. As soon as she saw the defendant handcuffed and on the ground, she became upset and verbally aggressive, but eventually calmed down. Detective Williams asked for identification and Ms. Silva said she had some but it was in the house. She got up and started walking towards the residence. Detective Williams tried to stop her explaining that, for safety reasons, he did not want her to go into the house without him. She continued walking, turned to look back at the detective, and proceeded to enter the house. When Ms. Silva gave no indication he could not enter, Detective Williams followed her, stepping into the doorway where he could see her.

Ms. Silva's purse was lying on an ottoman that was visible from the doorway. It was about ten feet away from where Detective Williams was standing. As she was getting her identification out of her purse he saw some marijuana on the ottoman. He retrieved it and asked Ms. Silva to go back outside. He had her sit down, handcuffed her and put the marijuana in a bag. Detective Williams told Detective Herren about the marijuana and defendant said it was his. The detective then told defendant he was under arrest for possession of marijuana. He called for a car to transport defendant.

While they were waiting for the transport vehicle, the detectives discussed the security of the residence and whether anyone else might still be in the house. They decided to do a

3

protective sweep,³ which Detective Herren conducted. No one else was found in the house.

Defendant then explained that his home had been broken into a several months before⁴ and that recently someone driving a green truck had attempted to steal a trailer that was parked in his driveway. He was suspicious of the officers because they were driving a green pickup, had passed his house multiple times and appeared to be stopping or slowing down as they went by. He could see shadows in the vehicle but not the occupants' faces because of the tint on the windows.

At some point Ms. Silva's handcuffs were removed and she was asked to sign a search waiver. She executed the waiver and returned to the residence with Detective Herren. He found additional marijuana and a pistol by the bed. Defendant admitted possession of both and stated that Ms. Silva knew nothing about them. He was then arrested for possession of the additional marijuana and the weapon, as he had a prior felony conviction.⁵

Defendant challenges the validity of his initial detention by the officers and Office Williams' initial entry into the house. He contends the officers improperly detained/arrested him because they did not have probable cause to believe he had committed an offense and lacked reasonable suspicion that he was engaged in criminal activity. He asserts they had no basis for entering his residence at any time and claims the firearm, discovered during the

---

³*Nothing was found during the protective sweep and its legality was not questioned by defendant.*

⁴*Defendant testified that, because he suspected a family member was involved in the burglary, he did not report it to the police.*

⁵*Defendant admitted that he had previously been incarcerated.*

4

subsequent search of defendant's home, was fruit of the poisonous tree.

Defendant admits he was suspicious of the unmarked police vehicle, was keeping an eye on it and had waved at it at least once.[6] His behavior, while understandable based on the burglary of his home and attempted theft of his trailer, was confusing to the officers. Although defendant disputes he flagged the police vehicle down, there was no other apparent reason for the officers to have stopped. Neither defendant nor the house he was standing in front of was under surveillance and the officers had no prior knowledge of, or information regarding, defendant. In fact, just before they stopped, there had been some activity at the house the officers were watching.

The officers were confronted with a situation where, from their perspective, an individual was behaving erratically and aggressively. He had initiated an encounter with them and then refused to talk with them or hang up the phone.[7] Although they established they were police officers, he refused to cooperate. Under the circumstances, they could detain him briefly to question him and find out what was going on.[8] When it appeared to the officers that defendant was threatening to strike detective Herren, they could, for defendant's

---

[6]*The officers may have thought he had waved at them again just before they stopped, as defendant testified that a neighbor had driven by and he had waved at him. Hearing Transcript, p. 66.*

[7]*The court did not find credible the officer's explanation that defendant was detained because he had violated a city ordinance regarding obstruction of a street.*

[8]*It is difficult to characterize the encounter here, which defendant initiated. Assuming it was an investigative detention, the court finds it was reasonable – justified at its inception and appropriately limited in scope and duration.*

5

and their own safety, handcuff him. *See* United States v. Garcia, 459 F.3d 1059, 1063 (10th Cir. 2006) ("During an investigative detention, [p]olice officers are authorized to take reasonable steps necessary to secure their safety and maintain the status quo.") (internal quotation omitted); United States v. Neff, 300 F.3d 1217, 1220 (10th Cir. 2002) ("Thus, a Terry stop does not become unreasonable just because police officers use handcuffs on a subject or place him on the ground."). Up to this point, the court finds no violation of defendant's Fourth Amendment rights.

The issue then becomes whether Officer Williams acted illegally when he followed Ms. Silva to the house and, without a warrant, stepped across the threshold.[9] Although a close question, the court concludes that under the facts of this case, he acted reasonably and did not violate defendant's Fourth Amendment rights.

At the point when the detective entered the house, the officers were unaware of the reasons why defendant had reacted negatively to them and their vehicle. They also lacked any information about defendant. However, Detective Williams was familiar with the neighborhood. He stated he had been there many times during the past two years and had another target house just around the corner from defendant's residence.[10] In just a matter of minutes the officers had been confronted by a combative defendant and a verbally aggressive

---

[9]*Until his counsel's closing remarks at the suppression hearing, defendant did not challenge the officer's action of asking Ms. Silva for identification. Defendant cannot, however, assert or rely on a claimed violation of someone else's constitutional rights.*

[10]*Although he did not expressly state that the home they were watching, as well as the target house mentioned, were being observed because of drug trafficking, that was obvious from the officer's testimony. See Transcript pp. 30-31.*

girlfriend in a neighborhood connected with drug activity. Although Ms. Silva had calmed down somewhat, the officers still had valid safety concerns when she got up and started towards the house despite being told she could not enter unaccompanied. It was not unreasonable for the officers to want to keep her within eyesight until they determined what was going on. Detective Williams stepped in the house only far enough to observe Ms. Silva as she retrieved her license from her purse.[11]

"'[A]bsent exigent circumstances [or consent], the firm line at the entrance to the house may not reasonably be crossed without a warrant.'" United States v. Thomas, 372 F.3d 1173, 1177 (10th Cir. 2004) (quoting Kirk v. Louisiana, 536 U.S. 635, 636 (2002)). Exigent circumstances that may justify a warrantless entry into a home include "the hot pursuit of a fleeing felon, the imminent destruction of evidence, the need to prevent a suspect's escape, or the risk of danger to police officers or other people inside or outside the home." *Id.* at 1177.[12]

The test applied to determine whether the risk of personal danger created exigent circumstances is "two-fold, whether (1) the officers have an objectively reasonable basis to believe there is an immediate need to protect the lives or safety of themselves or others, and (2) the manner and scope of the search is reasonable ...." United States v. Najar, 451 F.3d 710, 718 (10th Cir. 2006). "The inquiry determining the existence of an exigency is

---

[11]*There was no evidence before the court which indicated that the officer's entry into the residence was motivated by an intent to seize evidence.*

[12]*The government must establish exigent circumstances by a preponderance of the evidence. See United States v. Carr, 939 F.2d 1442, 1443 (10th Cir. 1991).*

essentially one of reasonable belief." *Id.* at 719. The court must "evaluate whether the officers were confronted with reasonable grounds to believe there was an immediate need 'guided by the realities of the situation presented by the record' from the viewpoint of 'prudent, cautious, and trained officers.'" *Id.* at 718-19 (quoting United States v. Anderson, 154 F.3d 1225, 1233 (10th Cir. 1998).

Considering the circumstances surrounding the entry and the minimal intrusion that occurred, the court concludes the officers were confronted with a reasonable basis for apprehension of a threat to their own safety sufficient to permit Detective Williams to step inside the door of the house while Ms. Silva retrieved her identification. The court also finds the officer reasonably concluded, based on Ms. Silva's conduct, that she impliedly consented to his following her into the house.

When asked about identification Ms. Silva headed towards the house, proceeding despite Officer Williams' attempt to stop her. In response to his telling her that she could not go in alone, Ms. Silva turned and looked at him and approached the front door.

An "individual's silence and acquiescence may support a finding of voluntary consent." United States v. Patten, 183 F.3d 1190, 1194 (10th Cir. 1999). The government bears the burden of showing that the consent was voluntary. The court concludes it has met that burden here, as a reasonable person would have understood by Ms. Silva's action that the officer could follow her into the residence.

The officer was properly within the entryway when he observed the marijuana in plain view and there is no valid basis for objecting to its seizure. The discovery of the marijuana

led the officers to ask Ms. Silva to execute a consent to search. Defendant did not challenge the validity of her written consent and it was during the subsequent search that the weapon was found and seized.

As the court concludes that neither the initial encounter between defendant and the detectives nor Detective William's subsequent warrantless entry into defendant's home violated defendant's Fourth Amendment rights, the gun and marijuana were validly seized. Accordingly, defendant's motion to suppress [Doc. # 15] is **DENIED**.[13]

**IT IS SO ORDERED**.

Dated this 3rd day of November, 2010.

_____
JOE HEATON
UNITED STATES DISTRICT JUDGE

---

[13]*Subsequent to the hearing the government advised the court and defense counsel that it appeared that Ms. Silva may have listened to some portion of the proceeding while awaiting being called to testify, after the rule of sequestration had been invoked. Neither party sought relief based on the possible rule violation and the court's decision has not been affected by the asserted infraction. The court concludes the witness' actions do not require further action in the circumstances existing here.*